# UNITED STATES DISTRICT COURT

for the

Western District of Michigan

Southern Division

|  | | Case No. _____ |
|---|---|---|
| LOREN OWENS | ) | *(to be filled in by the Clerk's Office)* |
| *Plaintiff* | ) | |
| | ) | |
| **-v-** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| ADROIT HEALTH GROUP, LLC, DBA | ) | |
| STRATA HEALTH GROUP & ADROIT | ) | |
| INSURANCE SOLUTIONS LLC | ) | |
| AMERICAN BUSINESS ASSOCIATION | ) | |
| TYLER LONG, | ) | |
| WESLEY CUNHA, DOES 1-133 | ) | |
| | ) | |

## COMPLAINT AND REQUEST FOR INJUNCTION

Plaintiff Loren Owens ("Plaintiff" or "Owens"), by and through her attorney, alleged the following against Adroit Health Group, LLC DBA Strata Health Group ("Defendant Adroit" or "Adroit"), Defendant American Business Association ("Defendant American Business Association"), Defendant Tyler Long ("Defendant Long"), Defendant Wesley Cunha ("Defendant Cunha") and Defendant Does 1-133 ("Doe Defendants")

## INTRODUCTION

1.   This action arises out of the offensive marketing practice of using pre-recorded messages and harassing phone calls of the Defendants Adroit Health Group, LLC dba Strata Health Group, Defendant American Business Associations, Defendant Long, Defendant Cunha, and Defendant Does by harassing the Plaintiff by causing her to be called 132 times in a two-day period, violating the Telephone Consumer Protection Act ("TCPA") 47 U.S.C. § 227 *et seq.* and the TCPA's corresponding regulations the Michigan Telephone Companies as Common Carriers Act ("MTCCCA"), M.C.L. § 484.101, et seq., the Michigan Home Solicitation Sales Act ("MHSSA"), M.C.L. § 445.101, et seq., for the Defendants own gain. The Defendants made these calls to individuals who had previously requested not to be called.

## PARTIES

2.   Plaintiff Loren Owens is a natural person of the age of majority, a citizen of the United States, and a resident of Clinton County, State of Michigan.

3.   Upon Information and belief, Defendant ADROIT HEALTH GROUP, LLC, DBA STRAT HEALTH GROUP is, and at all times herein mentioned was, a Texas Limited Liability Company, headquartered in the State of Texas doing business under the name "Strata Health Group" with its principal place of business at 1575 Heritage Drive, Ste 200, McKinney, TX 75069-3388 and doing business in the State of Michigan (hereinafter referred to as "Defendant Adroit" and/or "Adroit Health").

4.   Upon Information and belief, Defendant American Business Association is and at all times herein mentioned was an Illinois Domestic Not For Profit Corporation, doing business under the name "American Business Association" with its Corporations Principal Office at 12444 Powerscourt

Drive, Suite 500A, St. Louis, MO 63131 and doing business in the State of Michigan (hereinafter referred to as "American Business Association")

    a. American Business Association was registered in Missouri in June 2016 as a Foreign Nonprofit Corporation File No: E001409722

    b. On December 12, 2019, by administrative dissolution, American Business Association E001409722 had an "administrative dissolution or revocation for a Non-Profit Corporation for failure to comply with Section 355.706 of the Revised Statutes of Missouri.

    c. It was ordered that "A corporation administratively dissolved may not carry on any business except that necessary to wind up and liquidate its business and affairs under Section 355.691." and notice was served on their registered agent.

    d. A search of the Department of Internal Revenue Services Tax Exempt Organization does not show the American Business Association listed as a valid tax-exempt organization under federal law.

5. Upon Information and belief, Defendant Tyler Long is a person of the age of majority, is mentally competent, is not in the military, residing at 1217 S Dixie Highway West, Apt. 208, Pompano Beach, FL 33060, who is a Florida licensed insurance Agent with a business address of 1217 S Dixie Highway West, Apt. 208, Pompano Beach, FL 33060 (hereinafter referred to as "Defendant Long")

6. Upon Information and belief, Defendant Wesley Cunha is a person of the age of majority, is mentally competent, is not in the military, residing at 4831 NW 1st Way, Pompano Beach, FL 33064, and is a Michigan Licensed Insurance Agent with a business address of 4831 NW 1st Way, Pompano Beach, FL 33064 (hereinafter referred to as "Defendant Cunha")

7. Upon Information and belief, DOE DEFENDANTS 1-133 are fictitious names of individuals, businesses, and/or telemarketers that Plaintiff Alleges for the purpose of substituting

names of defendants whose identities are unknown but may be disclosed in discovery and should be made parties to this action. Specifically, Plaintiff has information and belief that John Does violated that TCPA.

8.   At all times relevant hereto, while conducting business in Michigan, Defendants have been subject to, and required to abide by, the laws of the United States and the State of Michigan, which included the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C § 227, et seq., and related regulations ("TCPA Regulations") that are set forth at 47 U.S.C. § 64.1200, as well as the opinions, regulations and orders issued by Courts and the Federal Communication Commission ("FCC") implementation regulations and enforcing the TCPA and the Michigan Telephone Companies as Common Carriers Act ("MTCCCA"), M.C.L. § 484.101, et seq., the Michigan Home Solicitation Sales Act ("MHSSA"), M.C.L. § 445.101, et seq.

9.   This case is filed pursuant to the Telephone Consumer Protection Act of 1991, 47 U.S.C. §227 et. seq. ("TCPA"). The U.S. Supreme Court decided that federal courts have federal question subject matter jurisdiction over such civil actions under 28 U.S.C. §§ 1331 and 1441. *Mims v. Arrow Fin. Services, LLC*, -- U.S. --, 132 S.Ct. 740, 753 (2012).

10.   At all times herein mentioned, each employee, representative, officer, director, consultant, or contractor of any Defendant was acting as its agent.

## JURISDICTION AND VENUE

11.   This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq., which is a federal statute.

12. This court has limited personal jurisdiction over the Defendant pursuant to M.C.L. § 600.715 as a result of the defendant transacting any business within the state and/or doing or causing any act to be done, or consequences to occur in the state resulting in an action for tort.

13. This Court has jurisdiction over the Defendant because it specifically commissioned telemarketing calls, including the calls to Plaintiff, to be sent to Michigan consumers, causing harm there, and it does business itself in Michigan.

14. This Court has supplemental jurisdiction over all Plaintiff's Michigan and common law claims under 28 U.S.C. § 1367(a) because they are so related to the TCPA claims in this action that arise under the Court's original jurisdiction that they form part of the same case or controversy under Article III.

15. Original diversity jurisdiction over the parties and the claims asserted herein pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendants, and the amount in controversy well exceeds $75,000.00 in the aggregate.

16. It would be extremely burdensome for Plaintiff to access another forum.

17. Upon information and belief, Defendant continuously and systematically placed unsolicited phone calls to consumers in the Western District of Michigan, using phone numbers from the "269" area code.

18. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the telemarketing tortious or illegal unwanted telephone calls at issue were sent into the Western District of Michigan where the Plaintiff's cell/wireless phone was located.

## INTRODUCTION

19.  In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the TCPA into law to protect consumers' privacy rights, specifically, the right to be left alone from unwanted telemarking calls.

20.  As the Supreme Court of the United States of America stated, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back." Barr v. Am. Ass'n of Political Consultants, No. 19-631, 2020 U.S. LEXIS 3544, at *5 (U.S. July 6, 2020).

21.  Senator Hollings of South Carolina, the primary sponsor of the bill, explained, "computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall... these computerized telephone calls threaten our personal safety... These machines are out of control, and their use is growing by 30 percent every year. It is telephone terrorism, and it has got to stop...." See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 17 FCC Rcd. 17459, 17474, fn. 90 (2002), quoting 137 Cong. Rec. 30,821-30,822 (Nov. 7, 1991).

22.  Advancements in telephone dialing technology, voice over internet protocol ("VoIP") phones, and the movement away from per-call, per-minute billing made mass calling to consumers by telephone simple, easy, and cost-effective.  This advancement in technology and software has caused an angering amount of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumers' time, electricity, phone service, and money.

"The FTC also continues to track how technology affects the Registry and the consumers and telemarketers who access it.  Advancements in technology have made it easier for bad actors to place illegal calls.  For example, Voice over Internet Protocol (VoIP) technology allows callers, including law-breakers, to make higher volumes of calls inexpensively from anywhere in the world.  Technological developments also allow illegal telemarketers to easily fake, or "spoof," the caller ID information that accompanies their calls, which allows them to conceal their identity from consumers and law enforcement.  Further, many telemarketers use automated dialing technology to make calls that deliver prerecorded messages (commonly referred to as "robocalls"), which allow violators to make very high volumes of illegal calls without significant expense.  The net effect of these technological developments is that bad actors who refuse to comply with the Registry or other telemarketing laws, are able to make more cheap and illegal telemarketing calls using methods that make it difficult for the FTC and other law enforcement agencies to find them."  Federal Trade Commission, Biennial Report to Congress, Under the Do Not Call Registry Fee Extension Act of 2007 for Fiscal Years 2022 and 2023, (2023).

23. As a result, the federal government and several states have enacted legislation to attempt to stop these widespread telecommunications abuses. As Congress Recognized:

> "Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes…. Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion."  Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

24. The FTC issued its Biennial Report to Congress on the National Do Not Call Registry in the Fiscal year 2023. The FTC received over 2.1 million companies for violations of the Do-Not-Call Registry.

25. According to the online robocall tracking service "YoMail," In America, there were just over 55 billion robocalls in 2023.  www.robocallindex.com (last visited May 23, 2024).

26. According to the online robocall tracking service "YoMail," for March 2024, in the United States, there were 4.3 Billion robocalls made, with an average of 137,500,000 per day or 5,700,000 per hour, 1,600 calls per second, or 13 calls per person—https://robocallindex.com/2024/march (last visited May 23, 2024).

27. According to online robocall tracking service "YoMail," for March 2024, in the 269 area code alone, there were 8.4 Million robocalls made, with an average of 270,400 per day or 11,300 per hour,

3.1 calls per second, or 10 calls per person with a 269 area code—https://robocallindex.com/269/2024/march (last visited May 23, 2024).

28. As is relevant here, federal law under the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides for injunctive relief and the greater of actual damages or $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(b)(3).

29. Defendants caused prerecorded calls to be made to Plaintiff's cell phone without her consent, and Plaintiff files this complaint on behalf of herself, seeking relief from Defendants' illegal calling practices.

## BACKGROUND ON THE TCPA

30. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

31. The TCPA prohibits making multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. See 47 U.S.C. § 227(c)(5).

32. The National Do Not Call Registry allows consumers to register their telephone numbers, indicating their desire not to receive telephone solicitations at those numbers. See 47 C.F.R. § 64.1200(c)(2).

33. A listing on the National Do Not Call Registry "must be honored indefinitely, or until the consumer or the telephone number cancels, the registration is removed by the database administrator." Id. The TCPA and implementing regulations prohibit the initiation of telephone

solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R.§ 64.1200(c)(2).

## BACKGROUND ON THE MHSSA

34. The Michigan Home Sale Solicitation Act (Public Act 227 of 1971) did not include telephone sales, but it was amended in 1978 specifically to include them.

35. The Michigan Legislature, seeing problems with the Federal do-not-call list, modified the Michigan Home Sale Solicitation Act (Public Act 227 of 1971). With House Bill 4154 "would require telephone solicitors to give certain information about themselves and the company they worked for and would prohibit the intentional blocking of caller ID."

36. The Committee on Energy and Technology Bill Analysis of  several proposed bills in the 2001 legislative session stated:

> "Despite existing federal and state laws regulating telemarketing, many people still feel that their rights to privacy and freedom from unsolicited telephone intrusions into their homes are not adequately protected by these laws. Existing laws not only allow numerous exemptions to telemarketers (despite the fact that it does not matter to most people who actually makes the unwanted telemarketing call or for whom) but also allow such calls to be made between 8:00 a.m. and 9:00 p.m. This means, in practice, that many people are interrupted by unsolicited telemarketing calls[.]" https://www.legislature.mi.gov/documents/2001-2002/billanalysis/House/htm/2001-HLA-4042-A.htm

37. The Committee on Energy and Technology Bill Analysis found that the overall package of bills "would balance citizens' rights to privacy and freedom from unsolicited telephone solicitation with businesses' free speech rights."

38. The Michigan legislature passed amendments to the MHSSA in 1998, 2002, and 2009 to help stem the tide of unwanted calls to consumers.

## **FACTUAL ALLEGATIONS**

39.  Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

40.  Plaintiff's telephone number, (269) XXX-5526, is a non-commercial telephone number not associated with any business.

41.  Plaintiff's telephone number is used for personal residential purposes.

42.  The plaintiff's telephone number has been listed on the National Do Not Call Registry since June 7, 2019.

43.  Plaintiff's residential cellular telephone line is listed on the federal do not call list. Yet, she is getting phone calls and text messages trying to sell everything from automotive warranties, health insurance, credit cards, selling your home, and more.  There are scam calls claimed to be from the Customs and Board Patrol,  the Sheriff's Department, and the Social Security Administration.

44.  The plaintiff has even had her phone number spoofed, so when people call her and say she just called them, they get upset and mad and want to know why she called them.

45.  In January 2021, Plaintiff was admitted to the hospital with a loss of pregnancy via stillbirth.

46.  She was admitted to the hospital for two days, and during that time, her phone was ringing off the hook because an unknown bad actor spoofed her phone number.

47.  People were calling and yelling at her and her family about calling their phones when she had not called anyone and was suffering one of the most significant losses of her life: her child.

48.  By listing her residential and cellular telephone numbers on the National Do Not Call Registry, Plaintiff has given constructive notice to the world, including every one of the Defendants, that Plaintiff does not wish to receive telephone solicitations or robocalls at her phone number.

49.     Plaintiff is a customary user of the called telephone lines, is the one that was the actual recipient of the telephone calls at issue in this complaint, and suffered the nuisance and invasion of her privacy.

50. Plaintiff has never been a customer of Defendant(s) and has never consented to receive calls from Defendant(s).

51. Plaintiff has never solicited or contacted the Defendant(s).

52. At no time has Plaintiff provided permission to the Defendant to engage in telephone solicitation with the Plaintiff via telephone.

53. The Plaintiff has never looked for private market or affordable care market insurance as she has been insured through her employers since 2017.

54. The FCC has clarified that sellers may be held vicariously liable for violations of the TCPA by third-party telemarketers who initiate calls to market the seller's products or services, declaring as follows.

> "[A] company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules, and calls placed by a third party on behalf of that company are treated as if the company itself placed the call." In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling, 20 FCC Rcd 13664, 13667, ¶ 7 (2005).

55. For each and every call alleged herein initiated to Plaintiff's telephone line, Defendants caused an injury in the form of a nuisance and annoyance to the Plaintiff. For calls that were answered, Plaintiff had to go to the unnecessary trouble of answering them. Even for unanswered calls, Plaintiff had to deal with missed call notifications and call logs that reflected the unwanted calls. This also impaired the usefulness of these features on Plaintiff's telephone, which features are designed to inform the user of important missed communications.

56. Each and every call placed without consent by Defendants alleged herein to Plaintiff's telephone lines resulted in the injury of a trespass to Plaintiff's chattel, namely Plaintiff's telephone line and its telephone services.

57. Defendant Adroit is in the business of selling health insurance.

58. Upon Information and belief, Defendant American Business Association is in the business of education, selling membership to service and offering discounted rates on Defendant Adroit Policy; the membership is sold with the health insurance policy.

59. Upon Information and belief, Defendant Adroit and the American Business Association employ independent contractors known as "agents" (Doe Defendants) who market and interpret the insurance and membership products to consumers.

60. Upon Information and belief, an enrolled agent can earn commission through a compensation plan for any insurance product or membership the agent sells.

61. Upon Information and belief, As part of the marketing program, Defendant Adroit sells telemarketing "leads" to agents/Doe Defendant(s).

62. Upon Information and belief, in addition to selling telemarketing leads, Adroit provides its agents with access to automated telephone dialing software/platforms and services that allow the Doe Defendants to contact consumers to sell Defendant Adroit and American Business Association products. These automated telephone dialing platforms use a random number or sequential number generator and have the capacity to call persons at random with no human involvement.

63. Upon Information and belief, Defendant Adroit and the American Business Association are well aware that the automated dialing platforms and telemarking activities that it directs its agent to use are illegal and violate the TCPA when calls are placed to phone numbers on the Federal Do-Not-Call list.

64. Defendant Adroit has been sued in various federal courts by plaintiffs, including class action suits related to the same tortious activity.

65. Upon Information and belief, Defendant Adroit and American Business Association are each well aware that the Doe Defendants and its agents engage in illegal telemarketing to sell their respective insurance products but said defendants engage in willful blindness and disregard evidence of said

illegal telemarketing as said defendants make substantial income resultant from the aforesaid illegal telemarketing activities.

66. Upon Information and belief, Defendant Adroit and the American Business Association lend support to the illegal telemarketing activities by giving the agents access to their respective computer systems for purposes of pricing data and entering prospective insureds' application information, as well as the authority to use the company's trademark and service market – all hallmarks of actual authority; and said defendants ratify the illegal telemarketing activities by accepting and processing the insurance applications so received.

67. Upon Information and belief, As part of their overall telemarketing program, Defendant Adroit and American Business Association and the Agents will outsource their outbound telemarketing to call centers utilizing automated telephone dialing systems to initiate telephone calls en masse to consumers to develop prospective buyers for the insurance products.

68. Based on information and belief, the call centers, in turn, hire individuals to act as lead generators—known in telemarketing parlance as "ropers" or "gatekeepers"—to pre-qualify called consumers as to whether they meet the qualification criteria for specific insurance products.

69. Upon Information and belief, The lead generator or "roper" or "gatekeepers" will engage in deceptive and illegal techniques to solicit consumers, including, inter alia, manipulating the caller identification such that the caller cannot be easily identified or called back; identifying with a false or generic-sounding business name; (Health Enrolment Center, The National Health Enrolment Center, and the Enrolment Center) deliberately calling telephone numbers which appear on the National Do Not Call Registry; refusing to provide identifying information to the called party upon inquiry; uttering profanities. To or otherwise threatening or harassing the called party if the consumer does not cooperate by expressing interest or providing requested personal information or the called party requests not to be called

70. Upon Information and belief, once a lead generator or "roper" has a consumer who meets the qualification criteria – referred to in telemarketing slang as the "mark" – the lead generator will then live to transfer the call to an Agent who will then attempt to close the sale of the insurance product to the consumer. It is usually only late at this stage that a called party might learn any identifying information about the source of the telephone call.

71. Upon Information and belief, Defendant Adroit and the American Business Association, the Agents, and the Insurance Companies are all well aware of the illegal tactics being used by their contracted call centers. Still, they are deliberately indifferent to what is occurring so as to be able to represent that they are "unaware" of the illegal telemarketing conduct.

72. Upon Information and belief, Because the telemarketers engage in such deceptive practices designed to conceal their actual identities, Plaintiff has had to engage in various methods to identify the sources of the telemarketing calls being received.

73. One method Plaintiff provided false information to the telemarketer or did not correct misinformation the telemarketer has in their database.

74. As discovery progresses in this case and Plaintiff is able to learn the identity or identities of the call centers that Defendants have utilized to initiate the telephone solicitations, Plaintiff will seek to amend this complaint to add the call centers as additional named defendants.

75. Upon information and belief, Plaintiff received **One Hundred and thirty-three (133) phone calls** (Exhibit 1 & 2) from the DOE Defendant(s) on behalf of Defendant Adroit and Defendant American Business Association from March 21 to March 23, 2024, from Defendants, acting through one or more authorized agent(s), knowingly and/or willfully initiated auto-dialed calls with pre-recorded messages to the Plaintiffs Residential Cell Phone number for commercial purposes of selling health insurance and membership in the American Business Association and thereby also the products

and services of all Defendants.  All One Hundred and thirty-three (133) phone calls were initiated without the Plaintiff's prior express consent, permission, or invitation.

    a.   Defendants knowingly and/or willfully:

        i.   Called without Plaintiff's prior express consent, permission or invitation;

        ii.   Used pre-recorded messages

        iii.   Failed to voluntarily state the caller's actual business name; and

        iv.   Failed to voluntarily state the caller's telephone number or address where the caller may be contacted.

76. The 132 calls in two days were "repeated with such persistence and frequency as to amount to a course of hounding the plaintiff."[1] That were an "irritating intrusion" into her privacy."

77. On information and belief, in each instance of Defendant Adroit and Defendant American Business Association transmitted or caused to be transmitted unsolicited phone calls themselves or had a high degree of involvement/knowledge in the transmitted phone calls.

78. On information and belief, Defendant Adroit and Defendant American Business Association knew the phone call marketing campaign was a telephone solicitation subject to the TCPA.

79. On information and belief, Defendant Adroit and Defendant American Business Association participated in the preparation of the screening questions.

80. As a direct and proximate result of said conduct, Plaintiff has sustained damages. Under the TCPA, Plaintiff is entitled to injunctive relief enjoying Defendant's unlawful conduct, as well as incidental, statutory damages.

81. Defendant Adroit and Defendant American Business Association knew that Plaintiff had not authorized the phone calls by prior express invitation or permission.

---

[1] "Gadelhak, 950 F.3d at 462 (citing Restatement § 652B cmt. d)." Dickson v. Direct Energy, LP, 69 F.4th 338 (6th Cir. 2023)

82. With the **One-Hundred and thirty-two** (132) phone calls occurring on March 21 and 22, 2024. The Defendants concealed their actual phone numbers using alternative phone numbers for their call center that used false business names such as "The Health Center," "the National Health Enrollment Center," the Health Enrolment Center' from the 269 area code in order to trick Plaintiff into answering a familiar number.

83. When Plaintiff called any of the 132 numbers, the call center employees would hang up when asking for any contact information for the company.

84. Plaintiff is more likely to answer a call from the "269" area code because of her contacts in that area code. She is inclined to believe that it could be an important call from someone she knows.

85. Defendants' bad faith tactics thwarted Plaintiff's legitimate efforts to block Defendants' calls because Defendant would use a new bank of "269" numbers. The plaintiff could not block the Defendants' numbers. Thus, each new phone call was from a fresh set of phone numbers.

86. As an additional measure, Plaintiff also tried to defend against Defendant's harassing calls by blocking their number on her cell phone.

87. On March 21, 2024, while at work, Plaintiff attempted to answer three of the calls.

    a. "Call No. 1" on March 21, 2024 at 10:55 A.M. EST.

    b. "Call No. 2" on Match 21, 2024, at 10:57 A.M. EST.

    c. "Call No. 65" on March 21, 2024, at 5:57 P.M. EST.

88. On March 21, without Plaintiff's prior express consent, permission or invitation, Defendants, through one or more authorized agent(s)/DOE defendants, knowingly and/or willfully initiated 68 auto-dialed calls with pre-recorded messages, starting at 10:55 A.M. EST to March 21, 2024, at 6:53 P.M. EST. Calls No. 3-64 & 65-71 to Plaintiff's Residential Telephone Number for the commercial purpose of selling healthcare insurance and membership in the American Business Association and

thereby also the product and services of all Defendants. All of these calls were initiated without the Plaintiff's prior express consent, permission, or invitation.

    a.   Defendants knowingly and/or willfully:

        i.   Called without Plaintiff's prior express consent, permission, or invitation;

        ii.   Used pre-recorded messages;

        iii.   Failed to voluntarily state the caller's name; and

        iv.   Failed to voluntarily state the caller's telephone number or address where the caller may be contacted.

89. The plaintiff heard beeps or clicks as the call appeared to be transferred from an automatic dialer to a live person.

90. "Call No. 1" disconnected after Plaintiff said, "Hello," she heard some response on the other end, but the call was disconnected. The call was abandoned.

91. "Call No. 2" went to the plaintiff's Voicemail as she did not pick up in time.

92. "Call No. 2" came in at 10:57 A.M. EST and left the following voicemail:

    a.   Your needs press one if you would like to speak with a licensed professional regarding your health insurance quote, or press two if you would like to be added to our do not call list. Thank you have a great day. We are here to help you find the best plan available that fits your needs. Press one if you would like to speak with a licensed professional regarding your health insurance quote, or press 2 if you would like to be added to our do-not-call list. Thank you have a great day. We are here to help you find the best plan available that fits your needs. Press one if you would like to speak with a licensed professional regarding your health insurance quote, or press 2 if you would like to be added to our do-not-call list. Thank you have a great day. We are here to help you find the best plan available that fits your needs. Press one if you would like to speak with a licensed professional regarding your health insurance quote, or press 2 if you would like to be added to our do-not-call list. Thank you have a great day. Sorry you were having difficulties Good Bye."

 

93. "Call No. 3" came in at 10:59 A.M. EST and left the following voicemail:

a. "needs press one if you would like to speak with a licensed professional regarding your health insurance quote or press two if you would like to be added to our do not call list. Thank you have a great day. We are here to help you find the best plan available that fits your needs. Press one if you would like to speak with a licensed professional regarding your health insurance quote, or press 2 if you would like to be added to our do-not-call list. Thank you have a great day. We are here to help you find the best plan available that fits your needs. Press one if you would like to speak with a licensed professional regarding your health insurance quote, or press 2 if you would like to be added to our do-not-call list. Thank you have a great day. We are here to help you find the best plan available that fits your needs. Press one if you would like to speak with a licensed professional regarding your health insurance quote, or press 2 if you would like to be added to our do-not-call list. Thank you have a great day. Sorry you were having difficulties Good Bye."

94. On "Call No. 65," the plaintiff heard a pre-recorded message like what had been left on her voicemail for "Call No. 2 & 3."

    a.   We are here to help you find the best plan available that fits your needs. Press one if you would like to speak with a licensed professional regarding your health insurance quote, or press 2 if you would like to be added to our do-not-call list. Thank you have a great day

95. Plaintiff pressed 1 to find out who kept calling her. She heard beeps or clicks as the call appeared to be transferred from an automatic dialer to a live person, and there was a long pause of more than a few seconds.

96. The plaintiff then heard a scripted telemarketing pitch screening her for health insurance from the defendant's agents.

97. The Defenant telemarketing agent said "This is regard to health insurance. Are you looking for an individual or family plan?"

98. The Doe Defendant's telemarketing agent then asked for the Plaintiff's Age.

99. The Doe Defendant telemarketer asked if the Plaintiff was currently on Medicaid/Medicare.

100.    The Doe Defendant telemarketer then asked if the Plaintiff was from the State of Michigan.

101.    The Doe Defendant telemarketer then asked if the Plaintiff had health insurance.

102.    The Doe Defendant telemarketer then asked about the cost of health insurance that the plaintiff had in the past.

103.    The Doe Defendant telemarketer then asked about the Plaintiff's household income.

104.    The Doe Defendant telemarketer then asked if the Plaintiff had savings or checking accounts.

105.    The Defendant telemarketer then told the Plaintiff that the average cost of a health insurance plan in her area was $300 a month and asked if this would be affordable. States that this coverage would be for urgent care, emergency care, prescriptions, and much more.

106.    The Doe Defendant Telemarketer then went on to tell the Plaintiff she could pick her own doctors.

107.     The Doe Defendant Telemarketer asked if it was something affordable.

108.     The Doe Defendant Telemarketer asked when the Plaintiff would like it to take effect.

109.     The Doe Defendant's Telemarketer stated that they would get her connected to a licensed agent in her state.

110.     The call was transferred to another agent, at which time Plaintiff Owens asked that they not call her anymore.

111.     The call was disconnected, and Plaintiff was unable to get more information at that time.

112.     The calls continued while Plaintiff was working a 10-hour shift on March 21, 2024.

113.     The calls were so frequent that they would be one after another.

114.     The Plaintiff is an intake clinician at a mental health hospital as a limited licensed social worker.

115.     Plaintiff has an iPhone and Apple watch, which are linked so that phone calls to her phone ring on the Plaintiff's watch, which she wears at all times when not charging.

116.     During her assessments with patients who are primarily suicidal, Ms. Owens must be focused on her ability to monitor, assess, document, and evaluate the answers of the patient in front of her.

117.     During these assessments, co-workers have been attacked and assaulted by mentally unstable individuals.

118.     It is imperative that Plaintiff not be interrupted during these assessments, yet her watch was constantly going off, causing her to lose focus, jeopardizing the patient and her own safety.

119.     The plaintiff did not want to remove her watch as she was at the time the parent of a seven-month-old girl and, if an emergency occurred, wanted to be reachable.

120.    Thus, the plaintiff was forced to keep silencing phone calls from numbers she did not know during her whole shift on Thursday and Friday, March 21 and 22, 2024.

121.    The phone calls were so numerous and often that even Plaintiffs coworkers made statements like:

"Damn, another one?"        "They're still calling you."  "They're trying to scam you."

122.    The phone calls continued on the Plaintiff's drive home.

123.    Each phone call on her drive home caused her to remove her attention from driving, jeopardizing her safety and other drivers on the road.

124.    Upon information and belief, on March 22, 2024, without Plaintiff's prior express consent, permission, or invitation, Defendants, through one or more authorized agent(s)/Doe Defendants, knowingly and/or willfully initiated 61 auto-dialed calls, starting at 9:01 A.M. EST March 22, 2024 to 6:40 PM on March 22, 2024.  Calls No. 72-132 to Plaintiff's Residential Telephone Number for the commercial purpose of selling healthcare insurance and membership in the American Business Association and thereby also the product and services of all Defendants. All of these calls were initiated without the Plaintiff's prior express consent, permission, or invitation.

    a.   Defendants knowingly and/or willfully:

        i.   Called without Plaintiff's prior express consent, permission or invitation;

        ii.   Failed to voluntarily state the caller's actual business name; and

        iii.   Failed to voluntarily state the caller's telephone number or address where the caller may be contacted.

125.    Upon information and belief, at 11:37 A.M. EST on March 23, 2024 (Call No. 133), without Plaintiff's prior express consent, permission, or invitation, Defendants, through one or more authorized agent(s)/Doe Defendants, knowingly and/or willfully initiated an auto-dialed call to Plaintiff's Residential Telephone Number for the commercial purpose of selling healthcare insurance

and membership in the American Business Association and thereby also the product and services of all Defendants. All of these calls were initiated without the Plaintiff's prior express consent, permission, or invitation.

    a.   Defendants knowingly and/or willfully:

        i.   Called without Plaintiff's prior express consent, permission or invitation;

        ii.   Failed to voluntarily state the caller's actual business name; and

        iii.   Failed to maintain a record of Plaintiff's previous demand that the caller place Plaintiff's name on its Do-Not-Call List;

        iv.   Failed to voluntarily state the caller's telephone number or address where the caller may be contacted.

        v.   Failed to honor Plaintiff's previous demand that the caller place Plaintiff's name on its Do-Not-Call List

        vi.   Failed to state at the beginning of the call that the purpose of the call was to make a sale.

126.    On "Call No. 133," the plaintiff heard a pre-recorded message like what had been left on her voicemail for "Call No. 2 & 3."

    a.   We are here to help you find the best plan available that fits your needs. Press one if you would like to speak with a licensed professional regarding your health insurance quote, or press 2 if you would like to be added to our do-not-call list. Thank you have a great day.

127.    The plaintiff pressed 1 to attempt to find out who kept calling her. She heard beeps or clicks as the call appeared to be transferred from an automatic dialer to a live person, and there was a long pause of more than a few seconds.

128.    The Plaintiff placed the call on speakerphone so that other people in the room could hear it.

129.     The plaintiff then heard a scripted telemarketing pitch screening her for health insurance from the Doe defendant's agents.

130.     The Defendant telemarketer identified themselves as Alex ("Doe Defendant 1, Alex")

131.     Doe Defendant 1 agent said "This is regard to health insurance. Are you looking for an individual or family plan?"

132.     Doe Defendant 1 telemarketing agent then asked for the Plaintiff's Age.

133.     Doe Defendant 1 telemarketer asked if the Plaintiff was currently on Medicaid/Medicare.

134.     Doe Defendant 1 asked if Plaintiff was "Thomas."

135.     Doe Defendant 1 telemarketer then asked if the Plaintiff was from the State of Michigan.

136.     Doe Defendant 1 telemarketer then asked if the Plaintiff had health insurance.

137.     Doe Defendant 1 telemarketer then asked about the cost of health insurance that the plaintiff had in the past.

138.     Doe Defendant 1 telemarketer then asked about the Plaintiff's household income.

139.     Doe Defendant 1 telemarketer then asked if the Plaintiff had savings or checking accounts.

140.     Doe Defendant 1 telemarketer then told the Plaintiff that the average cost of a health insurance plan in her area was $300 a month and asked if this would be affordable. Doe Defendant 1 stated that this coverage would be for urgent care, emergency care, prescriptions, and much more.

141.     Doe Defendant 1 Telemarketer then went on to tell the Plaintiff she could pick her own doctors.

142.     Doe Defendant 1 Telemarketer asked if it was something affordable.

143.     Doe Defendant 1 Telemarketer asked when the Plaintiff would like it to take effect.

144.    Doe, Defendant 1's Telemarketer, stated that they would connect her to a licensed agent in her state.

145.    The call was transferred to another agent.

146.    The Defendant telemarketer identified themselves as Tyler at the Health Center ("Defendant Long").

147.    Defendant Long identified himself as a licensed agent who would be helping Plaintiff.

148.    Defendant Long stated, "As a licensed insurance agent for your state, I do have access to all your available options."

149.    Defendant Long asked about the current insurance coverage that Plaintiff had.

150.    Defendant Long asked more qualifying questions and then returned with a "Nationwide PPO Plan."

151.    Defendant Long stated that there were two items the plan would not cover.

   a.  Inpatient substance abuse (drug/alcohol abuse)

   b.  Inpatient mental health coverage.

152.    Defendant Long provided a quote of the cost of $655.75 with an enrollment fee of $125.00.

153.    Defendant Long said he would be sending a contract for verification.

154.    Defendant Long reviewed a 1212 pre-existing condition clause, which had a 12-month waiting period.

155.    Defendant Long Went over a 30-day waiting period for doctor visits.

156.    Defendant Long Went over that the plan would not be qualifying under the Affordable Care Act as it did not meet the minimum requirements.

157.    Without asking permission, consent, or invitation first, Defendant Long sent a text to Plaintiff's phone for confirmation. Defendant Long just asked if he was speaking to the plaintiff on a smartphone.

158.    Defendant Long sent a text message with a hyperlink to the following website: https://www.a1healthcare.com/(uniqueID). (Sent from Top Healthcare Options Insurance Agency Inc. – Cunha, Wesley)



159.    Although this text was sent by Defendant Long, the Text Message states it is from Defendant Cunha.

160.    Based on information and belief, it appears that Defendant Cunha is allowing Defendant Long to use resources from his license in the state of Michigan to sell insurance without Defendant Long being licensed in Michigan.

161.    When asked who was underwriting the plan, defendant Long stated that Ally PPO would write it.

162.     Defendant Long was asked who the A1Healthcare website was and what Adroit Heath Group was.

163.     Defendant Long claimed that A1Healthcare was the enrolment portal and Adroit Health Care Group was the billing company.

164.     When asked who he worked for, Defendant Long stated that he was an independent contractor insurance agent Who claimed to represent all 38 major carriers in the state.

165.     Defendant Long stated, "I am a licensed Insurance Agent for the State of Michigan." This statement was false.

166.     Defendant Long was asked for his Michigan Insurance License number.

167.     Defendant Long suggested he walk Plaintiff through the website on the State of Michigan Department of Insurance page.

168.     Plaintiff and Defendant Long, on the phone call, did not find him as a licensed agent in Michigan.

169.     Defendant Long then suggested searching for licensed insurance agents in Florida.

170.     The plaintiff found that Tyler Long was a licensed agent in the state of Florida.

171.     These calls harmed the plaintiff, who was temporarily deprived of the legitimate use of her phone because the phone line was tied up, and her privacy was improperly invaded.

172.     Moreover, these calls injured the Plaintiff because they were annoying, obnoxious, frustrating, and intrusive, a nuisance that disturbed her solitude at work, on her way home, and at home.

173.     The calls further injured the Plaintiff by draining the battery on her iPhone and Apple Watch. Each call caused her phone to vibrate and alert her by illuminating the screen, causing increased electricity use and draining her battery.

174.    Using the battery for so many calls in a short time also limits the battery's useful life for both the iPhone and Apple Watch.

175.    In regards to each of the above-described 133 calls to Plaintiff's residential cell phone,

a.  For each call, except Call No. 34, 81, 82, 85, 92, 97, 99,107, 108, and 112, those calls were call waiting beeps on the phone call.

b.  Each call was a "telephone solicitation," as this term is defined in 47 U.S.C. § 227(a)(4);

c.  Each call was an "unsolicited advertisement," as this term is defined in 47 U.S.C §. 227(a)(5);

d.  Each call was initiated for the purpose of encouraging the purchase or rental of or investment in property, goods, or services, and, therefore, each was a "telephone solicitation" as defined in 47 U.S.C. § 227(a)(4).

e.  Each call was initiated by, for, at best or request on behalf of with the approval of, and/or for the benefit of each and all of the Defendants, and each and every Defendant cooperated in, directed, authorized, requested, aided, encouraged, approved, ratified and/or adopted the actions of any and all Defendants or Doe Defendant's agents initiating each call.

176.    In initiating and placing the 133 calls to the Plaintiffs Residential Cellular Telephone, Number, Defendants acted intentionally, knowingly, willfully, consciously, deliberately, and purposefully with a common plan, scheme, and/or design and for the Defendant's individual, mutual, and shared benefit.

177.    Each of the 133 calls was initiated with the intent and purpose of marketing Defendant Adroit Health products and Defendant American Business Association membership.  Each call was initiated with the intent and purpose of marketing Defendant Adroit and Defendant American Business Association products.

178.     The telemarketing sales call Defendants Adroit approved scripts for the use of screening individuals for health insurance policies in line with their underwriting guidelines. Defendant Adroit knew in advance that the health insurance campaign would use outbound telemarking calls. Defendant Adroit had the right to control the manner and means by which telemarking calls were placed by controlling the screening questions for the telemarking scripts.

179.     Defendants American Business Association knew in advance that the membership sale campaign would use outbound telemarketing calls. Defendant American Business Association had the right to control the manner and means by which membership in its association was sold.

180.     Defendants Adroit and the American Business Association shared in the revenue derived from the telemarking of products sold.

181.     Defendants Adroit have been sued for violations of the TCPA in the cases below, having actual knowledge of other complaints of these violations.

    a.  Newell v Adroit Health Group, LLC, case no. 2:2021cv05079 U.S. District Court for the Eastern District of Pennsylvania

    b.  Sapan v Adroit Health Group, LLC, case no. 8:23-cv-00120 U.S. District Court for the Central Division of California

    c.  Rowan v United Enrollment Service LLC et al., case no. 9:2022cv80235 U.S. District Court for Southern District of Florida.

    d.  Echols v Adroit Health Group LLC et al., case no. U.S. District Court for the Northern District of Alabama.

    e.  V Adroit Health Group LLC et al. case no. 0:18cv61931 U.S. District Court for the Southern District of Florida.

    f.  Javitch v Dentemax, LLC

g.   Barton v Sopi Financial LLC et al. case no. 3:21-cv-05934-RJB U.S. District Court for the Western District of Washington.

182.   On Information and Belief, Defendant Adroit had actual knowledge that its current use of Doe Defendant Agents was violating the TCPA by the prior-filed TCPA cases against them, which had ended in settlements.

183.   On the March 23, 2024, call, the Plaintiff was told she would receive documents concerning health insurance services and shortly thereafter received documents that Adroit Health sold the services.

184.   Plaintiff pleads on information and belief that the officers, managers, and employees for Adroit Health knew about the illegal telemarking calls as alleged above and, in fact, ordered such calls to be made.

185.   Additionally, Plaintiff pleads on information that Adroit Health knew its agents/Doe Defendants had been accused of making illegal telemarking calls as they have had complaints filed against them for the same conduct.

186.   Defendant Adroit failed to properly supervise or monitor the Doe Defendants despite having actual knowledge of other violations of the TCPA by Doe Defendants.

187.   Plaintiff further pleads on information that Adroit Health or its agents, Doe Defendants, used or faked or no CNAM on their initial calls in order to hide their identity, as Adroit Health knew they were conducting illegal telemarking.

188.   The March 21 and 22 phone calls did not identify Adroit Health or the American Business Association as the entity responsible for the calls.

189.   Defendants Adroit Health or its agents Association used fake or no Caller Name Delivery ("CNAM") on the calls, and failure to identify itself violates the TCPA's requirements.

190.     Due to Adroit Health's complex lack of compliance with the law, Plaintiff was forced to interact with agents Doe Defendants or employees of  Defendant Adroit Health to determine the maker of the calls, which would not have been necessary if Adroit Health had been properly complying with the TCPA and other federal and state laws.

191.     On the March 23, 2024, call, the Plaintiff was told she would receive documents concerning health insurance services; those documents revealed that She would also have to sign up for membership in the American Business Association.

192.     Defendant American Business Association was working in concert with Defendant Adroit to sell membership tied to the healthcare policies offered via telemarking.

193.     Plaintiff pleads on information and belief that to the extent Defendant Adroit Health uses any Doe Defendant agents to make calls, Defendant Adroit Health has ordered their agent to make the illegal telemarking calls to residential numbers on the National "Do-Not-Call" registry for its benefit to boost its sales.

194.     Plaintiff pleads on information and belief that to the extent  Defendant Adroit Health uses any Doe Defendant agents to make calls, Adroit Health knew or reasonably should have known (implied agency) that its agents were making the illegal calls to residential numbers on the National "Do-Not-Call" registry.

195.     Plaintiff pleads on the information and belief that to the extent Adroit Health uses any Doe Defendant agents to make calls, Adroit Health explicitly condoned the action of such agents in making the illegal telemarking calls to the residential numbers on the national "Do-Not-Call" registry for its benefit by condoning their action afterward.

196.     Plaintiff pleads on information and belief that to the extent Defendant Adroit Health uses any agents to make calls, Adroit Health explicitly hired by such agent in order to make the illegal telemarking calls to numbers on the National "Do-Not-Call"  Registry for the benefit of Adroit Health

**ACTUAL HARM & WILLFUL AND KNOWING CONDUCT**

197.     The Telephone Consumer Protection Act of 1991 ("TCPA") was passed in order to regulate telemarketing and requires that no telemarketer may call any number registered on the National "Do-Not-Call" Registry without prior express consent or a previously established business relationship.

198.     Defendants have intentionally violated the TCPA in a so-far successful attempt to sell membership services and health insurance.

199.     Plaintiff has been harmed by the junk calls complained of herein by the direct waste of her time during the call itself, the indirect waste of time in having to break from other important tasks, including conducting mental health assessments and spending time catching up after the junk call, the waste of telephone service which he and not Defendant must pay for, the costs of having to pursue legal remedies, and in the aggravation and consequent health effects of stress these illegal intrusions have caused.

200.     Plaintiff has been harmed by the calls she did not answer by the direct waste of her time in having to check the Caller ID. At the same time, she was busy with assessments or with patients seeking mental health help before declining the call, the indirect waste of time in having to break from other important tasks and spend time catching up after these junk calls, the waste of telephone service which she and not Defendant must pay for, the costs of having to pursue legal remedies, and in the aggravation and consequent health effects of stress these illegal intrusions have caused.

201.     During each of Defendant's calls, Plaintiff wanted to make or receive a call to/from someone else for her own personal or business reasons and was blocked from doing so by the line being tied up by Defendant.

202.     The plaintiff has been harmed by the calls she did not answer that went to voicemail and had a pre-recorded message, which she had to waste her time having to check and listen to the voicemail pre-recorded messages. The voicemails wasted storage space on her phone, the waste of telephone service which she and not Defendant must pay for, the costs of having to pursue legal remedies, and the aggravation and consequent health effects of stress these illegal intrusions have caused.

203.     As a proximate result of these intrusions, Plaintiff suffered an invasion of her privacy because the call should never have been transmitted to her. Defendants rang her private phone at her private residence, in her private car, and while at work on her phone and watch.

204.     Plaintiff alleges on information and belief that Defendants intentionally made the calls described above, in the sense that the number called was the one they meant to call in pitching their services and membership.

205.     Plaintiff alleges on information and belief that Defendant made the calls described above, knowing that they violated the TCPA and other telemarketing laws and regulations.

### CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**TCPA VIOLATIONS CALLS TO NUMBER ON**
**THE NATIONAL DO NOT CALL LIST**
(47 C.F.R. § 64.1200(c)(2))
(Against all Defendants)

206.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

207.     All 133 calls were in violation of the TCPA regulation, specifically 47 C.F.R. 64.1200(c)(2), as the Defendants or Doe Defendants' agent initiated telephone solicitation to a

residential telephone subscriber who has registered her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitation that the Federal Government maintains

208.     The aforesaid violations of the TCPA were Willful and/or knowing, as is evidenced by the repeated number of calls.

209.     The foregoing acts and omissions of Defendant and/or its affiliates, agents, and/or other persons or entities acting on Defendant's behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227. by making telemarketing calls, except for emergency purposes, to Plaintiff despite her number being on the National Do Not Call Registry.

210.     The defendant's violations were negligent, willful, or knowingly.

211.     Subdivision (c) (2) of Section 64.1200 of Title 47 of the Code of Federal Regulations makes it unlawful for any person to "initiate any telephone solicitation" to "A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations."

212.     At all times relevant to this complaint, Plaintiff had registered her residential telephone number on the national do-not-call registry maintained by the U.S. Government.

213.     Defendant has called Plaintiff's residential telephone line for solicitation purposes at least one-hundred thirty-three times between March 21-23 during the statutory period of the last four years, pursuant to 28 U.S.C. § 1658. These calls are the only calls known to Plaintiff at this time.

214.     Plaintiff states on information and belief, without yet having the aid of full discovery, that it is quite likely that Defendant has made many more violative calls to Plaintiff's residential telephone line. These calls were not made in error, nor did Defendant have express permission from Plaintiff to call, nor did Defendant have a personal relationship with Plaintiff. 37 C.F.R. § 64.1200 (c) (i), (ii), & (iii).

215.    The aforesaid violations of the TCPA were willful and/or knowing, as is evidenced by the repeated number of calls, as well as repetitive demands made by the Plaintiff to the callers not to call.

216.    Subdivision (c)(5) of section 227 of title 47 of the United States Code permits a private right of action in state court for violations of the National "Do-Not-Call" Registry rules promulgated thereunder. The plaintiff may obtain relief in the form of injunctive relief or recover up to $500.00 for each violation, or both. If the court finds that the Defendant's violations were willful or knowing, it may, in its discretion, award up to three times that amount.

## SECOND CAUSE OF ACTION
## TCPA VIOLATIONS AUTODIALER CALLS
(47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. §64.1200(a)(1)(iii))
(Against all Defendants)

217.    Plaintiff realleges all paragraphs above and incorporates them herein by reference.

218.    All one hundred and thirty-three calls violated the TCPA regulations, specifically 47 C.F.R. 64.1200(a)(3), as Defendants or Defendants' agent initiated telephone calls to a telephone line using an artificial or pre-recording voice to deliver a message without the express written consent of the party and there being no emergency.

219.    The aforesaid violation of the TCPA were willful and/or knowing that calls continued even after Plaintiff made the express request not to call demands to Defendants.

## THIRD CAUSE OF ACTION
## VIOLATIONS OF THE TCPA – DO NOT CALL REQUEST IGNORED
(47 C.F.R. § 64.1200(d)(3))
(Against all Defendants)

220.    Plaintiff realleges all paragraphs above and incorporates them herein by reference.

221.     Calls 66-133 violated the TCPA implementing regulations, specifically 47 C.F.R. 64.1200(d)(3), as Defendants or Defendants' agent initiated a telephone solicitation to a residential telephone subscriber who had previously made a do-not-call request.

222.     The aforesaid violations of the TCPA were willful and/or knowing, as evidenced by the repeated number of calls and the telephone call in which the telemarketer admitted that the Plaintiff's telephone number was on the do-not-call list.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF THE TCPA – FAILURE TO IDENTIFY
### (47 C.F.R. § 64.1200(d)(4))
(Against all Defendants)

223.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

224.     Calls No. 1, 2, 3, 65, and 133 violated the TCPA implementing regulations, specifically 47 C.F.R. 64.1200(d)(4), as Defendants or Defendants' agents entity making the call for telemarketing purposes did not provide the called party with the name of the individual caller, and/or the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.

225.     The aforesaid violation of the TCPA was Willful and/or knowing, as is evidenced by the repeated number of calls.

## FIFTH CAUSE OF ACTION
## VIOLATIONS OF THE TCPA – FALSIFIED CALLER ID
### (47 C.F.R. § 64.1601(e)(1))
(Against all Defendants)

226.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

227.     All one-hundred and thirty-three calls violated the TCPA implementing regulations, specifically 47 C.F.R. 64.1601(e)(1), as Defendants and/or Defendant's agent failed to provide caller identification information displaying a telephone number that would permit any individual to make a do-not-call request during regulation business hours.

228.     The fact that the Defendant or Defendant's agent had to take deliberate action to manipulate the caller identification information is evidence that the aforesaid violation of the TCPA was Willful and/or knowing.

229.     The Defendants, in bad faith, took deliberate and excessive actions to manipulate the telephone network equipment to provide false caller identification information; therefore, the aforesaid violations of the TCPA were willful and/or knowing.

**SIXTH CAUSE OF ACTION**
**VIOLATIONS OF THE TCPA – RECORDED MESSAGE CALLS**
(47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3))
(Against all Defendants)

230.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

231.     Calls No. 1, 2, 3, 65, and 133 violated the TCPA and its implementing regulations, specifically 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3), as Defendant or Defendant's agent initiated a telephone call to Plaintiff's residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party and there being no emergency. The aforesaid violations of the TCPA were willful and/or knowing, as evidenced by the repeated number of calls.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE TCPA REGULATIONS-ABANDONED CALLS**
(47 C.F.R. § 64.1200(a)(7))
(Against all Defendants)

232.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

233.     Calls 1 and 2 violated the TCPA Regulations, specifically 47 C.F.R. 64.1200(a)(7), as the call was not connected to a live sales representative within two (2) second of the called person's completed greeting.

234.     The aforesaid violations of the TCPA were Willful and/or knowing, as evidenced by the repeated number of calls.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF CIVIL CONSPIRACY**
(Against all Defendants)

235.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

236.     Defendants agreed among themselves to engage in a course of conduct involving a violation of 47 U.S.C. 227 and the TCPA regulations.

237.     Defendants agreed to accomplish an unlawful purpose by calling people on the do-not-call list or by accomplishing a lawful object by unlawful means, causing damages to Plaintiff.

238.     Defendants Adroit, Defendant American Business Association, Defendant Long, and Doe Defendants were working together and profited from violations of the TCPA.

239.     Defendants are working in concert by approving screening questions and having actual knowledge of prior unlawful conduct that violated the TCPA.

240.     The Plaintiff has been damaged by acts committed by Defendants pursuant to the civil conspiracy above.

241.     Defendant's conduct was intentional and premeditated, intended to unjustly benefit Defendants at the expense of Plaintiff, entitling Plaintiff to punitive damages in an amount sufficient

to deter these Defendants and others similarly situated from repeating or committing the wrongful acts complained of herein.

## NINTH CAUSE OF ACTION
## VIOLATIONS OF THE MHSSA
M.C.L. § 445.111a(5) & M.C.L. § 445.111b(1))
(Against all Defendants)

242.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

243.     All One hundred and thirty-three phone calls violated the MHSSA, specifically M.C.L. 445.111a(5), as Defendants or Defendants' agent made a telephone solicitation to a residential telephone subscriber whose name and residential telephone number is on the federal do-not-call list, and/or M.C.L. 445.111b(1), as Defendants or Defendants agents did not at the beginning of the telephone solicitation state their name and the full name of the organization on whose behalf the call was initiated to provide a telephone number of the organization on request.

## TENTH CAUSE OF ACTION
## VIOLATION OF THE MTCCCA
M.C.L. § 484.125(2)(a)
(Against all Defendants)

244.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

245.     "Calls No. 1, 2, 3, 65, and 133" violated the MTCCCA specifically M.C.L. § 484.125(2)(a), as Defendants or Defendants' agent used a telephone line to contact a subscriber at the subscriber's residence to deliver a recorded message for the purpose of presenting commercial advertising and the subscriber has not requested, consented, permitted, or authorized the contact.

246.     The aforesaid violations of the MTCCCA were Willful and/or knowing, as evidenced by the repeated number of calls.

## ELEVENTH CAUSE OF ACTION
## VIOLATION OF THE MTCCCA
M.C.L. 484.125(2)(b)
(Against all Defendants)

247.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

248.     All One hundred thirty-three phone calls violated the MTCCCA, specifically M.C.L. 484.125(2)(b).

249.     Defendant or Defendant's agent delivered or attempted to deliver intrastate commercial advertising by activating a feature to block the display of caller identification information that would otherwise be available to the subscriber. M.C.L. 484.125(2)(b).

250.     Defendants were selling a regulated health insurance product in the state of Michigan.

251.     Defendant Long Falsely Claimed to be a Licensed Michigan Insurance Agent on Call No. 133.

252.     Defendant Cunha is a Licensed Michigan Insurance Agent registered with the Michigan Department of Insurance and Financial Services.

253.     Doe Defendants purchased or selected phone numbers in the 269 area code so that people would answer their calls. Thus, the calls originated from Michigan.

254.     When the Doe Defendants selected to use the 269 area code, they chose to have their calls originate from Michigan; by selecting the 269 area code, they purposefully availed themselves of having the phone company originate their calls in the State of Michigan.

255.     Doe Defendants also sell a Michigan-regulated product to Michigan Consumers from the selected phone numbers in the 269 area code; thus, the calls were interstate calls to the view of the least sophisticated consumer.

256.     The aforesaid violations of the MTCCCA were Willful and/or knowing, as evidenced by the repeated number of calls.

## TWELFTH CAUSE OF ACTION
## INTRUSION UPON SECLUSION
### (Against all Defendants)

257.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

258.     The Restatement of the Law, Second, Torts §652B defines intrusion upon seclusion as, "[o]ne who intentionally intrudes…upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of privacy if the intrusion would be highly offensive to a reasonable person."

259.     According to findings by the FCC, the agency Congress vested with the authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

260.     Defendant intentionally interfered, physically or otherwise, with the solitude and seclusion of Plaintiff, namely by engaging in unlawful and intrusive communications.

261.     The defendant intentionally caused harm to Plaintiff's emotional well-being by engaging in harassing and unwanted phone calls and highly offensive conduct in the course of a sales pitch, thereby intruding upon Plaintiff's rights to privacy.

262.     Plaintiff has a reasonable expectation of privacy in her solitude, seclusion, and/or private concerns and affairs.

263.     These intrusions and invasions against Defendant by Plaintiff occurred in a way that would be highly offensive to a reasonable person in that position

264.     As a result of such invasions of privacy, Plaintiff is entitled to actual damages in an amount to be determined at trial from Defendant.

## THIRTEENTH CAUSE OF ACTION
### Intentional Fraud/Misrepresentation
(Against all Defendants)

265.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

266.     Defendants made an intentionally false misrepresentation by calling Plaintiff from a Caller ID number that showed it originated from the same area code as Plaintiff's cell phone.

267.     Defendants had knowledge of the phone number's falsity. The defendant called the plaintiff from her hometown area code to trick her into answering. The defendant's call center was not actually located in the Plaintiff's area code.

268.     The defendant intended to defraud and induce Plaintiff's reliance by persuading her to answer by falsely displaying caller ID from her hometown.

269.     Since Plaintiff regularly gets legitimate calls from the same area code, Plaintiff justifiably relied on the misrepresentations in deciding to answer the calls.

270.     The plaintiff has and continues to incur damages that are actual and recognized by statute.

## FOURTEENTH CAUSE OF ACTION
### Negligent Misrepresentation
(Against all Defendants)

271.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

272.     Defendants misrepresented the existing fact when they called Plaintiff from a falsified area code.

273.     Defendants lacked any reasonable grounds for believing it to be true that they were located in or calling from Plaintiff's hometown area code.

274.     Defendants intended that Plaintiff rely on their misrepresentation in order to induce Plaintiff into answering the call and hearing Defendants' advertising

275.     Defendants' efforts at spoofing and using fresh 269 numbers were a bad faith effort to further the effectiveness of Defendants' illegal conduct by sabotaging Plaintiff's legitimate efforts to screen calls from Defendants.

276.     Plaintiff effectively had no way to screen Defendants' calls because she could not distinguish between legitimate and fraudulent calls from Plaintiff's area code.

277.     Seeing the misrepresented "local" area code, Plaintiff justifiably relied on Defendants' misrepresentation in deciding to answer Defendants' calls.

278.     As a result of being called on her cell phone and hearing Defendants ring her phone for advertisements over a hundred times. The plaintiff has incurred and continues to incur damages that are actual and recognized by statute.

## FIFTEENTH CAUSE OF ACTION
### Negligence
(Against all Defendants)

279.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

280.     Defendants had a legal duty to use due care in their dealings with Plaintiff.

281.     Defendants breached that duty by calling the Plaintiff's cell phone hundreds of times, in violation of state and federal statutes, resulting in liability for common law torts.

282.     Defendants' breach was the proximate or legal cause of Plaintiff's injury.

283.     The plaintiff has incurred and continues to incur damages that are actual and recognized by statute.

## SIXTEENTH  CAUSE OF ACTION
### Gross Negligence

(Against all Defendants)

284.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

285.     Not only was Defendants' conduct towards Plaintiff negligent, as alleged above, it was grossly negligent.

286.     By intentionally designing a bad-faith strategy of calling Plaintiff from rotating, familiar-looking Caller ID numbers designed to trick Plaintiff into answering Defendants' calls and preventing her from screening, and indeed succeeding in getting Plaintiff to answer and necessitating a federal lawsuit, Defendants' conduct is such an extreme departure from the ordinary standard of care owed to Plaintiff that it constitutes gross negligence.

287.     The plaintiff has and continues to incur damages that are actual and recognized by statute as a result of the Defendants' gross negligence.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray that her court enter a judgment for the Plaintiff and against the Defendants,  jointly and severally as for judgment against Defendants, and each of them, as follows:

1.  A declaration that Defendants violated the TCPA, MTCCA, and MHSSA as to Plaintiff;

2.  **Damages for violations of the TCPA alleged**

      a.  Cause of Action 1, (47 C.F.R. § 64.1200(c)(2))
           $500.00 per violation with 133 violations           $66,500.00

      b.  Cause of Action 2,  (47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. §64.1200(a)(1)(iii))
           $500.00 per violation with 133 violations           $66,500.00

      c.  Cause of Action 3, (47 C.F.R. § 64.1200(d)(3))
           $500.00 per violation with 68  violations           $34,000.00

      d.  Cause of Action 4, (47 C.F.R. § 64.1200(d)(4))
           $500.00 per violation with five violations           $2,500.00

      e.  Cause of Action 5,  (47 C.F.R. § 64.1601(e)(1))
           $500.00 per violation with 133 violations           $66,500.00

        Cause of Action 6, (47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3))
           $500.00 per violation with five violations           $2,500.00

      f.   Cause of Action 7, (47 C.F.R. § 64.1200(a)(7))

         $500.00 per violation with two violations                $1,000.00

         TOTAL TCPA ALLEGED VIOLATIONS           $239,500.00

         A total of 479 violations at $500.00 per violation for statutory damages of

         $239,500.00, which Plaintiff asked to be trebled because the violations were willful

         and/or knowing, for a total damage award of $718,500.00

         The Sixth Circuit has held that a Plaintiff can recover under sections 227(b) and

         227(c) even if both violations arose from the same call. Charvat v. NMP, LLC, 656

         F.3d 440 (6th Cir. 2011)

3. Damages for violations of the MHSSA,  M.C.L. § 445.111a(5) & M.C.L. § 445.111b(1))

    a.   133 violations at $250.00 per violation for a total of $33,250.00.

4. Damages for violations of the MTCCCA M.C.L. § 484.125(2)(a)

    a.   five violations at $1,000 per violation for a total of $5,000.00

5. Damages for violations of the MTCCCA M.C.L. §  484.125(2)(b)

    a.   133 violations at $1,000.00 per violation for a total of $133,000.00.

6. **The cumulative total statutory damages claimed is $889,750.00**

7. For injunctive relief pursuant to 47 U.S.C. § 227(c)(5)(A);

8. Injunctive relief, pursuant to 47 U.S.C. § 227(b)(3), aimed at ensuring the prevention of

Defendants from violating the TCPA in the future, including:

    a.   Requiring Defendants to hire a Court-approved, independent auditing company to

       (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of

       Defendants' and their vendors' outbound calls – including calls originating from lead

       generators – to ensure that Defendants had consent and that the consumer had not

       previously asked that calls stop, and (c) report the results of the above investigations

       to the Court and Plaintiff's counsel on a quarterly basis for no less than five years.

9.  Damages, pursuant to 47 U.S.C. § 227(b)(3);

10. Actual and punitive damage for the Defendant's intrusion upon Plaintiff's seclusion.

11. For attorney's fees pursuant to all applicable federal and state statutes;

    a.  MTCCCA M.C.L. §  484.125(5).

    b.  MHSSA M.C.L. § 445.111c

12. For the cost of suit herein incurred and

13. Interest accruing from the date of filing until paid at the statutory rate;

14. For such further relief as the court deems just and proper.

## JURY DEMAND

The plaintiff requests a jury trial as to all claims of the complaint so triable.

Dated May 23, 2024,

              Lighthouse Litigation, PLLC

              /S/Joshua S. Goodrich, J.D., LL.M.

              _____
              By: Joshua S. Goodrich, J.D., LL.M. (P83197)
              Attorney for Plaintiff
              Lighthouse Litigation, PLLC
              5208 W Saginaw Hwy, 81142
              Lansing, MI 48908
              Phone (269) 312-7435
              Fax (646) 356-7044
              Email: jsgoodrich@lighthouse-litigaiton.com

## Document Preservation Demand

Plaintiff demands that each Defendant preserve all records and direct all vendors, agents, and other third parties with relevant documents or data to do so, too. Please contact the attorneys listed here to discuss this.